NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 11a0566n.06

No. 09-4473

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

*Aug 12, 2011*

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| MSI Regency, Ltd., | ) | |
|     Plaintiff-Appellee, | ) | |
| | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE |
| Alvin D. Jackson, M.D., et al. | ) | SOUTHERN DISTRICT OF |
| | ) | OHIO |
|     Defendant | ) | |
| | ) | O P I N I O N |
| and | ) | |
| | ) | |
| J. Nick Baird, M.D.; Christine A. Kenney; Jodi | ) | |
| Govern; Joel Kaiser; Madelyn Dile; Rebecca | ) | |
| Maust; Carol Ray; Martin L. King, | ) | |
| | | |
|     Defendants-Appellants. | | |

BEFORE:     MOORE, GIBBONS, and McKEAGUE, Circuit Judges.

**McKeague, Circuit Judge.**    Plaintiff-Appellant MSI Regency ("Regency") was granted a Certificate of Need from the Ohio Department of Health ("ODH") to rebuild its nursing home facilities. However, when ODH revoked that Certificate due to changes in Regency's planned activities, Regency lost substantial revenues on the stalled project. Regency brought suit under 42 U.S.C. § 1983 against several current and former ODH employees, in their personal capacities, alleging, *inter alia*, due process and equal protection violations.  The Defendants filed a motion to dismiss, based on qualified immunity and failure to state a claim. The district court denied the

motion, concluding that it could not determine whether the complaint alleged a constitutional violation. For the following reasons, we **REVERSE** the district court's judgment and hold that the defendants are entitled to qualified immunity.

**I.**

Plaintiff-Appellant Regency owns a nursing home and assisted living facility. On July 20, 2005, Regency applied for a Certificate of Need from ODH, in order to rebuild its outdated facilities. A Certificate of Need ("CON") is a required approval from the state to conduct a "reviewable activity." Ohio Revised Code Section 3702 defines a "reviewable activity" to include any "establishment, development, or construction of a new long-term care facility," "replacement of an existing long-term care facility," or "renovation of a long-term care facility . . . ." Ohio Rev. Code § 3702.51(R)(1)-(3). Also defined as a "reviewable activity" is "[a]ny change in the health services, bed capacity, or site, or any other failure to conduct the reviewable activity in substantial accordance with the approved application for which a certificate of need concerning long-term care beds was granted, if the change is made within five years after the implementation of the reviewable activity for which the certificate was granted." *Id.* at § 3702.51(R)(5).

Regency planned to tear down one building on its property (which was currently used for assisted living facilities) and build a new nursing home facility in its place, then move the existing nursing home residents into the new building. After this was completed, Regency intended to then demolish the old nursing home building and build a new assisted living facility. Regency's application included a description of its plan for care of the current nursing home residents—it stated that the existing facility would remain operational until the new building was completed and that

nursing home residents "will remain where they are [in the current nursing home facility] until the renovation is completed."

On November 1, 2005, ODH granted Regency a CON. However, before receiving the certificate, Regency had also applied to the Ohio Department of Housing and Urban Development ("HUD") for construction financing for this intended two-phase project. After receiving the CON, Regency was informed that HUD would not provide financing for the plan as currently laid out, but would finance the project if the nursing and assisted living facilities were built as one project—i.e., at the same time. Therefore, Regency changed its plan. Without discussing this change with ODH, Regency informed its long-term care residents in a letter dated December 15, 2005, that the existing facility would be closing no later than March 2006, and that they would have to relocate during construction. The letter offered assistance with relocation. The same day, Regency sent Defendant-Appellant, J. Nick Baird, then-Director of ODH, a letter entitled "90 Day Advance Notice of Intent to Close."

On January 6, 2006, ODH responded to the December 15th letter. In its response, written by Defendant Christine Kenney, Section Chief of Health Care Services at ODH, the Department noted that the Certificate of Need's approval was conditioned on Regency's representation in its application that the renovation would "progress without any impact on the ongoing care and services to the residents who will remain where they are until the renovation is completed." ODH's letter warned Regency that "[f]ailure to comply with this aspect of the approved project may initiate procedures to withdraw the certificate of need."

Regency alleges, and Defendants deny, that Regency (through its representative, Managing Member Akiva Wagschal) discussed ODH's January 6 letter with another ODH representative, John Hoffman, and with the ODH Assistant Counsel, Defendant Carol Ray, who stated that the concerns in Kenney's January 6 letter were "unprecedented," and suggested how to respond.

Regency responded to ODH with a letter dated January 10, 2006. Regency initially disputed Kenney's statement that the Certificate of Need contained a condition regarding the residents' location. Regency went on to explain the changed financial circumstances and thus the change in its plan, and then acknowledged that "[t]his turn of events necessitated making a minor change in the original documented" plan. Regency's letter to ODH also noted that some residents were displeased with the plan requiring them to move, and so, "[w]ith a heavy heart, deep regret and great reluctance, on December 27, 2005, we [Regency] issued them 30 day advance notices of our intent to transfer them." This letter to residents was in fact entitled "Eviction Notice," and stated that the residents would be "transfer[red] and discharge[d]" in January because "the facility is closing."

Importantly, Regency's letter then went on to say "I respectfully request that if a 'determination of non-reviewability' is required," because of the modification to the plan, "that this letter be considered our request for a determination."

Despite their receipt of the January 6 letter from ODH, expressing concerns about Regency's closing of the facility, Regency continued with its plan to close. It informed ODH on January 25 that all residents had moved or been relocated, and that the nursing facility was officially closed. On February 2, Defendant Kaiser (on behalf of Defendant Kenney and ODH) sent Regency a form

document, which did not refer to the January 10 letter or the relocation, but simply was a routine form that requested copies of design drawings.

However, on February 23, Defendant Baird, then-Director of ODH, responded to Regency's January 10 letter. Presumably responding to Regency's request, he treated Regency's letter as a request for a reviewability determination on the changes in the CON conditions. ODH explained that "as approved, the existing facility was to remain open and operational and residents were to remain in the existing building until the new building was constructed and they could be relocated." The letter further stated that "[a]fter being made aware that the relocation of residents prior to completion of the new building was an issue with the Certificate of Need, you proceeded with the relocation of residents and closure of the existing facility." ODH concluded that Regency's decision to relocate the residents was a "reviewable activity."

Shortly thereafter, ODH informed Regency that "[b]y relocating residents and closing the existing Regency Village facility, contrary to the approved CON application," Regency had "failed to conduct the reviewable activity in substantial accordance with the approved application." Because Regency's actions were a "substantial" change from the conditions upon which the Certificate of Need was granted, ODH found Regency in violation of Ohio Revised Code § 3702.53(C). ODH considered the fact that "[t]he Department learned of the deviation from the approved CON from the managing Long-Term Care Ombudsman for Cincinnati and not from the holder of the CON. In addition, the holder of the CON continued with implementation of the deviation after receiving notice from the Department that the approved CON requires the long-term care residents to be permitted to remain." The Director of Health therefore revoked the project's CON, levied a statutory

penalty, and assessed a period of three years during which no subsequent applications for CON's would be granted to Regency. ODH formally withdrew the CON on May 15, 2006.

Regency appealed all of ODH's rulings to the Ohio Court of Appeals, pursuant to the procedures in Ohio Revised Code § 3702.60. The Court of Appeals affirmed the Director's determination that the relocation of residents was a "reviewable activity." *In re MSI Regency Village, Ltd.*, 2008 Ohio 3830, at *3 (Ohio App. July 31, 2008). It also affirmed the Director's conclusion that Regency failed to conduct the activity in "substantial accordance" with the application as required. *Id.* The court reasoned that the fact that the regulation "requires a feasible plan for the residents living in a facility proposed to be relocated," supports the contention that "the state of Ohio has a compelling state interest in the treatment of Ohio citizens residing in long-term care beds, particularly when a major disruption may occur if the beds are to be relocated or replaced." *Id.* at *4.

The state court found that "in this case, the closing of the facility and the relocation of the residents were precisely the opposite of what [Regency] had represented in the CON application for its plan of care for the residents." *Id.* Ultimately, the court concluded that the Director acted within his discretion to impose the penalties of withdrawal and a moratorium. It affirmed the imposition of, but lowered the amount of, the assessed penalty, based on statutory language governing the penalties.

An appeal to the Ohio Supreme Court was timely filed, but it was not until after the present proceedings were initiated—and the first motion to dismiss at issue in this case was denied—that the Ohio Supreme Court refused the appeal for review, making the Ohio Court of Appeals' decision the final state court decision. *In re MSI Regency Village, Ltd.*, 120 Ohio St.3d 1457 (2008).

Plaintiff filed this civil suit on October 26, 2007, alleging that the Defendants—all ODH employees but all sued only in their individual capacities—knowingly and recklessly abused their positions and conspired with each other to deprive Regency of its planned project by "misapplying and misinterpreting" the CON regulations. Count I was brought under 42 U.S.C. § 1983, alleging that the Defendants are personally liable for violating Regency's due process, equal protection, and just compensation rights.[1]

The Defendants moved on August 29, 2008 to dismiss the complaint. They argued that as public officers being sued in their personal capacity, they are entitled to qualified immunity. The district court applied the analysis required by *Saucier v. Katz*, 533 U.S. 194 (2001): 1) Determine whether the plaintiff's constitutional rights were violated, 2) If so, determine whether the right was "clearly established" from the standpoint of a reasonable public official, and 3) If so, determine whether the official conduct was objectively unreasonable given the clearly established right in question. The court assumed, for purposes of the motion, that Regency had a protected property interest in the CON, and noted that property interests in state-issued permits are likely "clearly established."

---

[1]Count II alleged that the withdrawal of the CON was premature because Regency had appealed the determination about whether the relocation was a "reviewable activity," and therefore by revoking the CON prior to that review, the Defendants perpetrated an "administrative taking" of Regency's property. Count III sought a preliminary injunction against the CON withdrawal. However, the district court dismissed Count II without prejudice, for failure to exhaust available state remedies, and that determination has not been appealed. Count III was not pursued by Regency at the district court level. Therefore, only Count I is at issue in this appeal.

In addressing whether Regency's rights were violated, the district court considered each alleged theory in turn. It held that Regency failed to adequately allege a procedural due process claim, as notice and an opportunity to be heard were clearly received. On Regency's equal protection theory, the court noted that plaintiff did not allege any class-based disparate treatment and must proceed as a "class of one"; it must therefore show it was treated differently from others in Regency's situation, and that there is no rational basis for the state actor's differential treatment. The court concluded that plaintiff's "own pleadings strongly suggest a rational basis for ODH's actions, as the statute defines a 'reviewable activity' as a failure to conduct the project 'in substantial accordance with the approved application . . . .'" However, noting that "an equal protection challenge can also proceed on allegations that government action was motivated by animus or ill-will," the court concluded that Plaintiff's allegations could plausibly be read to allege such animus.

Lastly, the district court addressed the substantive due process theory. The complaint alleged that Kenney "ignored Plaintiff's responses to her January 6, 2008 letter; provided 'false factual information' to other ODH staff; purposely misapplied and misinterpreted the CON rules; refused to give Plaintiff the opportunity to stop the planned closing of its old facility; and misled Plaintiff to believe that its January 11 letter was acceptable to ODH." It further alleged that "[o]ther Defendants . . . conspired with Kenney. . . [and] failed to investigate and/or failed to adequately supervise ODH staff." Overall, the court concluded that Plaintiff alleged all defendants conspired with each other to harm Plaintiff by depriving him of the CON needed to complete the construction project," and therefore, "Plaintiff's allegations if true, could support a plausible claim." It warned

Regency, however, that "conspiracy claims must be pled with some degree of specificity and that vague and conclusory allegations unsupported by material facts will not be sufficient."

Addressing the Defendants' claim of qualified immunity, the court concluded that it "[could not] determine from the pleadings whether Plaintiff's constitutional due process or equal protection rights were violated by the Defendants' alleged conduct. The Court must therefore deny the motion to dismiss based on qualified immunity." The court specified, however, that the motion for qualified immunity was denied "without prejudice to renewal at the appropriate juncture." The Defendants did not appeal from this September 2008 decision.

Thereafter, the United States Supreme Court issued two new decisions, *Pearson v. Callahan,* 555 U.S. 223, 129 S. Ct. 808 (2009), and *Ashcroft v. Iqbal*, 566 U.S. ___, 129 S. Ct. 1937 (2009). It was also at this time that the Ohio Supreme Court refused to accept the state court appeal for review, leaving the Ohio Court of Appeals' decision upholding ODH's actions as the final state court decision. Based on the intervening United States Supreme Court cases, the Defendants filed a "Supplemental Motion to Dismiss" on August 26, 2009, contending that the new case law established that Defendants are entitled to qualified immunity, and/or that Regency's complaint fails to adequately plead a claim. Defendants argued that because *Pearson* held that courts no longer must approach the *Saucier* factors in a certain order, the court should proceed to consider the other prongs in order to grant Defendants the "basic thrust of the qualified-immunity doctrine." They further argued that the complaint contains "no factual content," but merely "legal conclusions and conclusory statements" that "cannot unlock the doors of discovery." The district court concluded that "*Pearson* does not substantively change the law but confirms that the courts may approach the

immunity question in the manner best suited to the facts and circumstances of each case," but did not conduct an analysis of the second *Saucier* prong. The court also concluded that this case was unlike *Iqbal* because "Plaintiff has not sued far-off officials," but instead "details the sequence of events and his communications with the various individuals . . . that culminated in the revocation of Plaintiff's Certificate of Need." It held that while the complaint's allegations suggest negligent conduct, "that is not the only *plausible* conclusion to be placed upon the events as alleged." The court therefore denied the motion. It is from this decision that the Defendants have appealed.

**II.**

Before proceeding to the merits, we must consider our jurisdiction to hear this appeal. A district court's denial of a motion to dismiss is generally not appealable because the applicable statute, 28 U.S.C. § 1291, only vests us with jurisdiction over a "final decision" of the trial court. The Supreme Court has held, however, that "a district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment." *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). This is true at either the dismissal stage or the summary judgment stage. *Behrens v. Pelletier*, 516 U.S. 299, 307 (1996). In *Johnson v. Jones*, 515 U.S. 304, 313 (1995), the Court clarified that *Mitchell* was "explicitly limited . . . to appeals challenging, not a district court's determination about what factual issues are 'genuine,' . . . but the purely legal issue what law was 'clearly established.'" (internal citations omitted). Therefore, this Court has jurisdiction over interlocutory denials of qualified immunity, to the extent that they turn on a question of law.

Here, two motions were involved. The Defendants filed their first motion to dismiss on the basis of qualified immunity and failure to state a claim on August 29, 2008. At that time, the state court appeal was pending regarding the interpretation of the CON regulations and the actions of the ODH employees. The district court ruled that it could not determine whether the facts as alleged by plaintiff demonstrated a violation of Regency's substantive due process or equal protection rights, and therefore denied qualified immunity, with leave to renew at the appropriate time. Because *Saucier* was the current governing authority, and required judges to first answer the question whether a constitutional violation has occurred before addressing whether the Defendants' conduct was a violation of clearly established rights, the court did not go on to address the second *Saucier* prong.

However, after that decision, much changed. First, the decision of the Ohio Court of Appeals became final when the Ohio Supreme Court denied review. This constituted a final state court interpretation of state law and regulations. The Ohio Court of Appeals upheld ODH's interpretation of the CON regulations as valid, deciding that Regency's relocation of residents was a "reviewable activity," finding that Regency's actions were "precisely the opposite" of what their application had said, agreeing with ODH that Regency failed to conduct its activity in "substantial accordance" with the application, and upholding ODH's decision to withdraw the CON, impose a moratorium, and levy penalties.

Second, the United States Supreme Court decided *Pearson* and *Iqbal*. *Pearson* involved a qualified immunity claim, and reversed *Saucier's* requirement that courts follow a "rigid order of battle" in assessing the qualified immunity prongs. *Iqbal* further clarified the standard for assessing the sufficiency of a complaint, originally announced in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544

(2007), but also specifically addressed the standard's applicability to conspiracy claims. The Defendants therefore filed their second motion to dismiss, arguing that "due to the pronouncements" in these new cases, "it appears that this is the appropriate juncture for the Defendants' to again request dismissal based on Qualified Immunity and the sufficiency of the Complaint." Both the intervening change in Supreme Court precedent and the intervening state court interpretation of the relevant state law provided a non-frivolous basis for the Defendants to file a second motion, and for the district court to entertain it. *See Rodriguez v. Tenn. Laborers Health & Welfare Fund*, 89 F. App'x 949, 959 (6th Cir. 2004); *see also Louisville/Jefferson Cty. Metro Government v. Hotels.com, L.P.*, 590 F.3d 381, 389 (6th Cir. 2009).

However, the district court denied this supplemental motion, and it is from that order that the Defendants now appeal. Regency argues that because Defendants did not appeal the first order, this Court is without jurisdiction to hear an appeal from the second. We disagree. *Comstock v. McCrary*, 273 F.3d 693 (6th Cir. 2001), was very similar to our case and is controlling. In *Comstock*, the defendants had filed, and the district court denied, a motion for summary judgment based on qualified immunity.

> All three defendants then filed a renewed motion for summary judgment arguing for qualified immunity in light of this court's decision in *Williams v. Mehra*, 186 F.3d 685 (6th Cir.1999) (en banc), handed down after the district court's first order. Thereafter, the district court held a hearing on the applicability of *Williams* to the case before it, and again denied the defendants' motion for summary judgment. . . . Defendants' timely interlocutory appeal followed.

*Comstock*, 273 F.3d at 700. Though the *Comstock* defendants had appealed from the denial of their second motion, and had failed to appeal their first, this Court held that "because this case turns on

whether the facts . . . 'show a violation of clearly established law,' not on 'which facts the parties

may be able to prove,' the district court's denial of qualified immunity is a 'final order' under 28

U.S.C. § 1291, and we have jurisdiction to decide the case on the merits." *Id.* at 701 (quoting

*Johnson*, 515 U.S. at 311). We likewise have jurisdiction to consider the present appeal.[2] We

therefore proceed to the merits.

## III.

The Qualified Immunity Standard

We review the district court's denial of qualified immunity de novo. *Moldowan v. City of

Warren*, 578 F.3d 351, 374 (6th Cir. 2009). In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme

Court laid out the two-step inquiry for determining whether state officials are entitled to qualified

immunity. First, the court must ask: "Taken in the light most favorable to the party asserting the

injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Id.* at 201.

Second, "if a violation could be made out on a favorable view of the parties' submissions, the next,

---

[2]This is especially true because the intervening law not only changed the legal standards, but also changed the Defendants' ability to appeal. The district court's first order dealt exclusively with the first *Saucier* prong of qualified immunity analysis; it did not render a conclusion regarding whether the rights allegedly violated were "clearly established." Further, the district court denied qualified immunity because it "could not determine" from the pleadings whether a violation had occurred— essentially, factual determinations would need to be made. As a "question of fact" was the basis for the district court's decision, this Court would not have jurisdiction to hear an appeal on that issue, *Johnson*, 515 U.S. at 313, but could also not properly reach the second *Saucier* prong because the "rigid order of battle" was still in place. *Pearson* changed that. *Pearson* provided a basis for which the Defendants could ask the district court to again assess qualified immunity, but because either *Saucier* prong can now be addressed without first addressing the other, *Pearson* also provided an appealable issue appropriate for this Court's review: whether the right at issue was "clearly established."

sequential step is to ask whether the right was clearly established." *Id.* The district court followed

this sequential analysis in the present case. Because the court concluded that it "[could not]

determine from the pleadings" whether Regency's rights were violated, it therefore felt it could not

(and need not) go forward to the second question, and denied the Defendants qualified immunity.

But in *Pearson*, the Supreme Court made an important change to the law which governs the

qualified immunity analysis. Recognizing broad criticism of *Saucier's* "rigid order of battle," the

Court concluded that the sequence "should no longer be regarded as mandatory." 129 S. Ct. at 818-

19 (internal citation omitted). Instead, judges should "exercise their sound discretion in deciding

which of the two prongs of the qualified immunity analysis should be addressed first in light of the

circumstances in the particular case at hand." *Id.*[3]

The district court could not reach the second *Saucier* prong, assessing whether the

Defendants had violated a right that is "clearly established," when ruling on the Defendants' first

motion to dismiss. But *Pearson* now allows us to reach and analyze the second *Saucier* prong first,

if it serves the purposes of qualified immunity. We find the second prong dispositive in this case.

---

[3]*Pearson* had good reason for this change. It noted that where, as here, "a constitutional
decision rest[s] on an uncertain interpretation of state law," it is of little value. *Id.* at 819. It also
noted that the *Saucier* order is "uncomfortable" when "whether there was a violation may depend
on a kaleidoscope of facts not yet fully developed." *Id.* (internal citation omitted). And most
importantly, the Court noted that "*Saucier's* two-step protocol 'disserve[s] the purpose of qualified
immunity' when it 'forces the parties to endure additional burdens of suit . . . when the suit otherwise
could be disposed of more readily.'" *Id.* at 818 (internal citations omitted) (alteration in original).
Therefore, the Court instructed judges that they can now reach the second *Saucier* prong first, if it
"will best facilitate the fair and efficient disposition of each case." *Id.* at 821.

Government officials are entitled to qualified immunity, and thus are shielded from actions for damages, "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987). "[M]ore concretely, whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action." *Id.* (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982)). Though case law often speaks of qualified immunity in terms of whether a "clearly established" right was violated, this is sometimes misleading. For example, in this case, the district court presumed that a "clearly established" right was involved, because Regency had a property interest in its state-issued CON. However, "the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Creighton*, 483 U.S. at 640.

Here, it is not enough that Regency has clearly-established property rights, and rights of due process and equal protection; instead, it must have been "sufficiently clear" at the time that the Defendants' actions surrounding Regency's CON would violate Regency's substantive due process and equal protection rights. *Anderson*, 483 U.S. at 640.

The Claims at Issue

Substantive due process "protects specific fundamental rights of individual freedom and liberty from deprivation at the hands of arbitrary and capricious government action." *Sutton v. Cleveland Bd. of Educ.*, 958 F.2d 1339, 1350 (6th Cir. 1992). A substantive due process claim

requires the plaintiff to allege (1) a constitutionally protected property interest that (2) was deprived by arbitrary and capricious state action. The government action must be such that it "shocks the conscience," *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998), and "mere negligence is definitely not enough." *Hunt v. Sycamore Comm. School Dist. Bd. of Educ.*, 542 F.3d 529, 535 (6th Cir. 2008). Furthermore, even if the Defendants' actions can be viewed as shocking the conscience, "substantive due process requires only that the [Defendants] show that [their decisions were] rationally related to a legitimate government interest." *Midkiff v. Adams Cty. Regional Water Dist.*, 409 F.3d 758, 769 (6th Cir. 2005) (citing *Mansfield Apt. Owners Ass'n v. City of Mansfield*, 988 F.2d 1469, 1477 (6th Cir.1993).

Moreover, "[w]here a substantive due process attack is made on state administrative action, the scope of review by the federal courts is extremely narrow. To prevail, a plaintiff must show that the state administrative agency has been guilty of 'arbitrary and capricious action' in the *strict* sense, meaning 'that there is no rational basis for the . . . [administrative] decision." *Pearson v. City of Grand Blanc*, 961 F.2d 1211, 1221 (6th Cir. 1992) (omission and alteration in original) (quoting *Stevens v. Hunt*, 646 F.2d 1168, 1170 (6th Cir. 1981)). This is a highly deferential standard.

As to equal protection, Regency does not allege a class-based disparate treatment, and so proceeds as a "class of one" under *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). Because no protected class is involved, this Court must apply rational basis review. *Hadix v. Johnson*, 230 F.3d 840, 843 (6th Cir. 2000). Regency must show that it was "intentionally treated differently from others similarly situated," and importantly, "that there is no rational basis for the difference in treatment." *Olech*, 528 U.S. at 564. Those attacking the rationality of a government

- 16 -

action under the rational basis standard bear the burden "to negative every conceivable basis which might support it." *FCC v. Beach Communications, Inc*., 508 U.S. 307, 315 (1993).[4]

In this case, Regency claims that the Defendants' decisions—declaring their movement of residents to be a "reviewable activity," objecting to the change in their plans, removing of their CON, etc.—violated their substantive due process and equal protection rights.  The district court held that it "could not determine" whether Regency's rights had been violated by the decisions and actions of the Defendants.  However, the intervening finality of the state court judgment alters this analysis.  Because the state court considered the propriety of the Defendants' actions, and ruled in their favor, collateral estoppel prevents this Court from finding that "a reasonable official" would believe such actions violated Regency's rights.  *Anderson*, 483 U.S. at 640.

Collateral Estoppel

"A fundamental precept of common-law adjudication . . . is that a 'right, question, or fact distinctly put in issue and directly determined by a court of competent jurisdiction . . . cannot be disputed in a subsequent suit between the same parties or their privies . . .'" *Montana v. United States*, 440 U.S. 147, 153 (1979) (quoting *Southern Pac.  R.R. Co. v. United States*, 168 U.S. 1, 48-49 (1897)).  Issue preclusion (collateral estoppel) refers to the effect of a judgment in foreclosing

---

[4]A minority of cases state that a plaintiff may demonstrate a lack of rational basis *either* by "negativing every conceivable basis which might support" the government action or by demonstrating that the challenged government action was motivated by animus or ill-will.  *See Warren v.  City of Athens*, 411 F.3d 697, 711 (6th Cir. 2005).  However, *Olech* did not contemplate this second path for a "class of one." *See Olech*, 528 U.S. at 564.  In any event, the law still requires the plaintiff to show that animus or ill-well led the defendant to treat them differently *than similarly-situated parties*. Since Regency does not put forward a similarly-situated party that was treated more favorably in these circumstances, their bare assertions of animus are unavailing.

- 17 -

relitigation of an issue that has been actually litigated and decided. *Migra v. Warren City Sch. Dist. Bd. Of Ed.*, 465 U.S. 75, 77 n.1 (1984).

28 U.S.C. § 1738 requires federal courts to give state court judgments the same res judicata effect[5] that they would be given by another court of that state. *Id.* at 84.[6] We must therefore look to Ohio law to determine the preclusive effect of the state court judgment upholding the department's actions.

Under Ohio law, issue preclusion "holds that a fact or a point that was actually and directly at issue in a previous action, and was passed upon and determined by a court of competent jurisdiction, may not be drawn into question in a subsequent action between the same parties or their

---

[5]Res judicata—the preclusive effect of a judgment—encompasses two distinct doctrines: claim preclusion and issue preclusion. *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008). Claim preclusion, which forecloses "successive litigation of the very same claim" or of claims which could have been brought in a prior action, *id.*, is not at issue in this case. Issue preclusion, synonymous with collateral estoppel, *Cobbins v. Tenn. Dep't of Transp.*, 566 F.3d 582, 589 (6th Cir. 2009), is relevant to this case, and "bars 'successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment,' even if the issue recurs in the context of a different claim." *Sturgell*, 553 U.S. at 892 (quoting *New Hampshire v. Maine*, 532 U.S. 742, 748-49 (2001)).

[6] The parties have not raised issue preclusion explicitly. Nevertheless, this court "ha[s] not failed to exercise our jurisdiction to reach an issue that the parties have not briefed where it involves a 'pure question of law that cries out for resolution.'" *Hutcherson v. Lauderdale Cnty*, 326 F.3d 747, 756 (6th Cir. 2003) (quoting *Rybarczyk v. TRW, Inc.*, 235 F.3d 975, 984 (6th Cir. 2000); *see generally United States Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 445-48 (1993) (confirming the power of appellate courts to consider an issue not raised by the parties). The Supreme Court has indicated that a court may take the initiative to assert the res judicata defense sua sponte in "special circumstances." *Arizona v. California*, 530 U.S. 392, 412, 120 S.Ct. 2304, 147 L.Ed.2d 374 (2000). Here, the defense of res judicata was not available to Defendants prior to their motions to dismiss, as the state case was still pending review before the state supreme court. Now that the state decision has become final, it is appropriate for this Court to respect its conclusions.

privies, whether the cause of action in the two actions be identical or different." *Fort Frye Teachers Ass'n, OEA/NEA v. State Employment Relations Bd.*, 81 Ohio St.3d 392, 692 N.E.2d 140, 144 (1998) (citing *Norwood v. McDonald*, 142 Ohio St. 299, 52 N.E.2d 67 (1943)). Regency's complaint alleges violations of its constitutional rights under the Fifth and Fourteenth Amendments. All of the factual assertions contained therein are put forward to support one central allegation: that the Defendants "misapplied and misinterpreted" the CON rules and regulations, or conspired with and failed to supervise those who did so, to wrongfully deprive Regency of its CON. But the Ohio Court of Appeals reviewed each action of the Board that has been challenged in this case. That court concluded that (1) the Board's interpretation of the regulation was correct, (2) the removal of the residents was a "reviewable activity," (3) Regency's change in the plan was a failure to conduct the activity in "substantial accordance" with the CON application, and (4) the Director acted within his discretion to remove the CON, impose a fine, and place a moratorium on new applications from Regency. *In re MSI Regency Village, Ltd.*, 2008 Ohio 3830, at \*3,\*5.

Collateral estoppel "thus precludes our review of the issues raised in this action." *Hutcherson*, 326 F.3d at 759. Both Regency and ODH were parties to the state court appeal, and the factual basis for this federal action is the same as that underlying the state court proceeding. It does not matter that Regency now seeks money damages, which were not sought in the state appeal.[7]

---

[7]Additionally, "for purposes of res judicata, privity between defendants is established where a plaintiff brings two lawsuits against the same public officials for acts performed in their official roles, even though the defendants are sued in their official capacities in one lawsuit and in their individual capacities in the other." *Kirkhart v. Keiper*, 101 Ohio St. 3d 377 (Ohio 2004).

Instead, "[t]he relevant inquiry focuses on whether the federal action would require us to revisit issues . . . that were litigated . . . in the state court." *Id.*

Regency's counsel does not successfully dispute that the Ohio court's decision forecloses success on its claims. At oral argument, the Court asked, "Assume that you're stuck with the [Ohio] Court of Appeals' decision—which, as of today, you are—how do you win?" Counsel did not respond. The Court continued, "You can't, can you?" Counsel could only reply, "I don't know." Later, when asked, "What constitutional right . . . is violated when [a state official] acts in accordance with state law and regulations?," Regency's counsel plainly responded, "None."

Because a final decision in the state court upheld the actions and decisions of the ODH employees, it is very clear that "a reasonable official in the [Defendants'] position could have believed his conduct to be lawful." *Poe v. Haydon*, 853 F.2d 418, 423 (6th Cir. 1988) (citing *Creighton*, 107 S. Ct. at 3039-40). On its substantive due process claim, Regency cannot establish that the Defendants clearly knew that what they did would violate Regency's rights, such that it would rise to the level of "arbitrary and capricious" action that would "shock the conscience." Instead, their actions were found to be permissible and, indeed, correct, and to have a rational basis. For the same reasons, Regency also cannot defeat qualified immunity on its equal protection claim: it cannot establish that Defendants clearly knew that their decisions (reviewing an activity that is properly reviewable, and penalizing them for failing to "substantially comply" with their application) constituted "irrational or arbitrary" acts that lacked any "rational basis."

It is obvious at this stage that qualified immunity applies to protect the Defendants from damages because not only did they not violate a "clearly established law"—they violated no law at

all.  The decision of the Ohio Court of Appeals defeats Regency's contention that the Defendants

"misapplied and misinterpreted" the CON rules at all, or failed to supervise others who were doing

so.  It also defeats Regency's contention that it was wrongfully denied its CON.  "If a reasonable

officer is not on notice that his or her conduct under the circumstances is clearly unlawful, then

application of qualified immunity is appropriate." *Ray v. Township of Warren*, 626 F.3d 170, 173

(3rd Cir. 2010). Therefore, Defendants are entitled to qualified immunity.

**IV.**

We therefore **REVERSE** the decision of the district court and grant the Defendants qualified

immunity on all claims. As the complaint only seeks damages against the Defendants in their

personal capacities, all remaining claims are resolved by the qualified immunity issue, and we need

not reach the second issue on appeal.  Regency's claims against the Defendants are **DISMISSED**.

**KAREN NELSON MOORE, Circuit Judge, concurring in the judgment.** I believe that we have jurisdiction to hear this appeal and that the defendants in this case are entitled to qualified immunity because their actions did not violate clearly established federal law.  Therefore, I concur in the judgment.  *Pearson v. Callahan*, 555 U.S. 223 (2009), did not change the substantive standards for qualified immunity; it merely held that a court may consider the second prong of the qualified-immunity test first if it chooses.